**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Pearl Reiss, individually, and as surviving spouse of Henry Reiss, deceased, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| Komatsu America Corp. and Diesel Machinery, Inc., | ) ) | Case No. 1:08-cv-082 |
| | ) | |
| Defendants. | ) | |

Before the Court are the Defendants' motions for summary judgment filed on December 22, 2009 and December 29, 2009.  See Docket Nos. 20 and 22.  The Plaintiff filed responses in opposition to the motions on January 28, 2010.  See Docket Nos. 25 and 26.  Defendant Komatsu America Corp. filed a reply brief on February 4, 2010.  See Docket No. 28.  For the reasons set forth below, the motions are granted in part and denied in part.

I.    **BACKGROUND**

The plaintiff, Pearl Reiss, is a resident of North Dakota.  The Plaintiff's decedent, Henry Reiss, was employed by Mariner Construction[1] to operate heavy construction equipment on jobsites. On September 26, 2006, Henry Reiss used a nine-wheel pneumatic rubber tire roller compactor known as the Galion P-3000 (P-3000) in the performance of his duties.  The P-3000 is used by contractors to compact asphalt pavement.  The P-3000 was manufactured by Tema Terra Maquinaria Ltda., a Brazilian company.  See Docket No. 6.  The compactor was imported by Dresser Industries,

_____

[1]  Mariner Construction is an asphalt construction company in Bismarck, North Dakota.

Inc. and sold by the Galion division of Dresser Industries (Dresser/Galion).  Defendant Komatsu America Corp. (Komatsu) is a successor company to Dresser Industries.  Komatsu is a Georgia corporation with its principal place of business in Rolling Meadows, Illinois.

Defendant Diesel Machinery, Inc. (Diesel Machinery) is a South Dakota corporation with its principal place of business in Sioux Falls, South Dakota.  Diesel Machinery is in the retail business of selling, renting, and servicing construction equipment, including the P-3000.  In September 1989, Diesel Machinery purchased a P-3000 from Dresser/Galion.  Dresser/Galion provided "pricing sheets" to its dealers to show the available options on the compactor. Dresser/Galion provided Diesel Machinery a pricing sheet for the P-3000.  See Docket No. 23-4. The pricing sheet indicates in bold print that a rollover protective structure (ROPS) was available for the compactor and could be ordered separately through Saf-T-Cab:[2]

> **NOTE:  Canopy, ROPS, Open w/Seat Belt is available from Safe-T-Cab 1-800-344-7491.**

See Docket No. 23-4.  Dresser/Galion also provided Diesel Machinery brochures of the P-3000.  It was standard practice for Diesel Machinery to stamp its address and telephone number on the brochure and provide the brochure to interested customers.  See Docket No. 21-12, pp. 43-44.  The brochure provided the general specifications of the P-3000, a description of the standard equipment, and a description of the factory-installed optional equipment and attachments.  See Docket No. 21-5. Included in the optional equipment and attachments was the "ROPS structure" which was available from Saf-T-Cab.  See Docket No. 21-5.

---

[2]  Saf-T-Cab is an engineering firm which specializes in designing, testing, and manufacturing rollover protective structures.  See Docket No. 23-2, p. 3.  By 1986, Saf-T-Cab had produced a rollover protection structure for the P-3000.  See Docket No. 23-2, p. 4.

Diesel Machinery did not order a ROPS for the P-3000.  In July 1990, Mariner Construction leased the P-3000 from Diesel Machinery.  See Docket No. 21-3.  On the day the P-3000 was delivered to Mariner Construction, Francis Schumacher, the shop foreman at Mariner Construction, rolled it as he was taking the machine to a jobsite, jumped free of the machine, and was not injured. See Docket No. 23-6, p. 5.  Francis Schumacher testified that he looked in the operation and maintenance manual to determine if a ROPS could be purchased for the machine, but made no further inquiries.  See Docket No. 23-6, p. 11.  Mariner Construction subsequently purchased the P-3000 on December 31, 1990.  See Docket No. 21-4.

Henry Reiss was an experienced heavy equipment operator who also had prior experience using compactors.  See Docket Nos. 21-10, p. 39 and 23-8, p. 16.  On September 26, 2006, Henry Reiss used the P-3000 to compact a gravel road leading to the ethanol plant near Richardton, North Dakota.  The edge of the road was marked by stakes with pink markers on top.  See Docket Nos. 23-7, p. 15 and 23-8, p. 15.  It is undisputed that Henry Reiss was operating the P-3000 beyond the stakes.  The compactor rolled into the ditch and Henry Reiss died as a direct result of the injuries sustained from the rollover.  James Schable, a truck driver who had passed Reiss just minutes before the compactor rolled, agreed that he was concerned about where the compactor was being operated in relation to the edge of the road and testified that he thought it was "scary, maybe, as far as for tipping over or whatever."  See Docket No. 23-9, p. 4.

On August 28, 2008, the Plaintiff filed an action in Stark County District Court against Komatsu and Diesel Machinery, alleging claims of (1) strict products liability, (2) failure to warn at the time of manufacture, (3) failure to warn at the time of the discovery of the danger, (4) negligence, (5) breach of warranty of merchantability, and (6) breach of warranty of fitness for a

particular purpose.  See Docket No. 1-1.  On September 24, 2008, Komatsu removed the action to

federal district court.  See Docket No. 1.  The Defendants now move for summary judgment on all

of the Plaintiff's claims.


## II.   **STANDARD OF REVIEW**

Summary judgment is appropriate when the evidence, viewed in a light most favorable to

the non-moving party, indicates no genuine issues of material fact exist and, therefore, the moving

party is entitled to judgment as a matter of law.  Davison v. City of Minneapolis, Minn., 490 F.3d

648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(c).  Summary judgment is not appropriate if there

are factual disputes that may affect the outcome of the case under the applicable substantive law.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of material fact is genuine if

the evidence would allow a reasonable jury to return a verdict for the non-moving party.  Id.

The Court must inquire whether the evidence presents sufficient disagreement to require the

submission of the case to a jury or if it is so one-sided that one party must prevail as a matter of law.

Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005).  The moving party

first has the burden of demonstrating an absence of genuine issue of material fact.  Simpson v. Des

Moines Water Works, 425 F.3d 538, 541 (8th Cir. 2005).  The non-moving party "may not rely

merely on allegations or denials in its own pleading; rather, its response must . . . set out specific

facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).

This action is based on diversity jurisdiction.  Therefore, the Court will apply the substantive

law of North Dakota.  See Paracelsus Healthcare Corp. v. Philips Med. Sys., Nederland, B.V., 384

F.3d 492, 495 (8th Cir. 2004).

### III.   LEGAL DISCUSSION

### A.   DIESEL MACHINERY

Diesel Machinery moves for summary judgment on all of the Plaintiff's claims, arguing that it is a non-manufacturing seller of the P-3000 and, therefore, is entitled to dismissal under N.D.C.C. § 28-01.3-04[3] without further review.  In the alternative, Diesel Machinery seeks summary judgment on counts II and III (failure to warn claims) and counts V and VI (breach of warranty claims).

Section 28-01.3-04 of the North Dakota Century Code governs the liability of non-manufacturing sellers.  Section 28-01.3-04 provides:

1.   In any products liability action maintained against a seller of a product who did not manufacture the product, the seller shall upon answering or otherwise pleading file an affidavit certifying the correct identity of the manufacturer of the product allegedly causing the personal injury, death, or damage to property.

2.   After the plaintiff has filed a complaint against the manufacturer and the manufacturer has or is required to have answered or otherwise pleaded, the court shall order the dismissal of the claim against the certifying seller, unless the plaintiff can show any of the following:

   a.   That the certifying seller exercised some significant control over the design or manufacture of the product, or provided instructions or warnings to the manufacturer relative to the alleged defect in the

---

[3] N.D.C.C. ch. 28-01.3 applies to products liability actions.  The North Dakota Century Code defines a "product liability action" as

any action brought against a manufacturer or seller of a product, regardless of the substantive legal theory or theories upon which the action is brought, for or on account of personal injury, death, or property damage caused by or resulting from the manufacture, construction, design, formula, installation, preparation, assembly, testing, packaging, labeling, or sale of any product, or the failure to warn or protect against a danger or hazard in the use, misuse, or unintended use of any product, or the failure to provide proper instructions for the use of any product.

N.D.C.C. § 28-01.3-01(2) (emphasis added).  The Plaintiff brought claims of strict products liability, failure to warn, negligence (on the basis of design and manufacture), and breach of warranties of merchantability and fitness.  All of the Plaintiff's claims fall within a product liability action for the fatal injuries Henry Reiss sustained while operating the P-3000 on September 26, 2006.

              product which caused the personal injury, death, or damage to property.

    b.    That the certifying seller had actual knowledge of the defect in the product which caused personal injury, death, or damage to property.

    c.    That the certifying seller created the defect in the product which caused the personal injury, death, or damage to property.

3.    The plaintiff may at any time prior to the beginning of the trial move to vacate the order of dismissal and reinstate the certifying seller if the plaintiff can show any of the following:

    a.    That the applicable statute of limitation bars a product liability action against the manufacturer of the product allegedly causing the injury, death, or damage.

    b.    That the identity of the manufacturer given to the plaintiff by the certifying defendant was incorrect.

A "manufacturer" means "a person or entity who designs, assembles, fabricates, produces, constructs, or otherwise prepares a product or a component part of a product prior to the sale of the product to a user or consumer. The term includes any seller of a product who is owned in whole or significant part by the manufacturer or who owns, in whole or significant part, the manufacturer." N.D.C.C. § 28-01.3-01(1).

In an attempt to comply with N.D.C.C. § 28-01.3-04(1), Diesel Machinery submitted an affidavit on behalf of its president, Dan Healy, which states that the manufacturer of the P-3000 at issue in this case is Galion Manufacturing Division, Dresser Industries, P.O. Box 67, Galion, Ohio 44833. See Docket No. 9. David D. Nardo, general counsel for Komatsu, submitted an opposing affidavit which states that the manufacturer of the P-3000 is Tema Terra Maquinaria Ltda., a Brazilian company. See Docket No. 6. David Nardo further states in his affidavit,

        Komatsu America Corp. was not the manufacturer or seller of the machine involved in the accident. The machine was purchased by Dresser Industries, Inc.

6

> ("DI") or Komatsu America International Company (formerly Komatsu Dresser Company) ("KAIC") from Tema Terra Maquinaria Ltda., and DI or KAIC would have been the seller of the machine in the United States.  Komatsu America Corp. is the successor in interest to KAIC for machines sold after September 1, 1988, by KAIC.

See Docket No. 6.  In a supplemental affidavit, Dan Healy states he does not have the requisite knowledge to either agree or disagree with the information contained in David Nardo's affidavit.  See Docket No. 10.

Nonetheless, Diesel Machinery argues that Komatsu is properly considered a "manufacturer" under N.D.C.C. § 28-01.3-01(1) as the apparent manufacturer of the P-3000.  Diesel Machinery states,

> [Komatsu], under its name at the time, Komatsu Dresser, held itself out as the manufacture[r] of the P-3000 by its labels on the machine, in its product literature, in its correspondence to [Diesel Machinery], and in its warranty to Mariner Construction.  The actual P-3000 displays two plaques labeling the P-3000 with the Dresser name, and its trade name, Galion.  Nothing on the machine indicates that it was manufacture[d] by Tema Terra.  Further, the operator's manual, [identified] the P-3000 as being a Galion Dresser machine without any indication that it was not actually manufactured by Komatsu Dresser or by Galion.

See Docket No. 21 (internal citations omitted).  Diesel Machinery's argument is premised on the principles set forth in the Restatement (Second) of Torts § 400 (1965) and Restatement (Third) of Torts: Products Liability § 14 (1998).[4]  The Restatement (Second) of Torts § 400 provides:  "One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer."  North Dakota courts have not had an opportunity to consider whether the North Dakota Supreme Court would adopt the apparent manufacturer doctrine as set

---

[4]  The Restatement (Third) of Torts: Products Liability § 14 (1998) derives from the Restatement (Second) of Torts § 400 (1965).  The Restatement (Third) of Torts: Products Liability § 14 provides:  "One engaged in the business of selling or otherwise distributing products who sells or distributes as its own a product manufactured by another is subject to the same liability as though the seller or distributor were the product's manufacturer."

forth in the Restatement (Second) of Torts § 400 or the Restatement (Third) of Torts: Products Liability § 14.

A majority of the jurisdictions that have considered the issue have adopted the apparent manufacturer doctrine. These include Alabama, Sears, Roebuck & Co. v. Morris, 136 So. 2d 883, 885 (Ala. 1961); Arkansas, Chapman Chem. Co. v. Taylor, 222 S.W.2d 820 (Ark. 1949); California, Cravens, Dargan & Co. v. Pac. Indem. Co., 105 Cal. Rptr. 607, 611 (Cal. Ct. App. 1972); Indiana, Dudley Sports Co. v. Schmitt, 279 N.E.2d 266, 273, 274 (Ind. Ct. App. 1972); Iowa, Tice v. Wilmington Chem. Corp., 141 N.W.2d 616, 628 (Iowa 1966); Kansas, Davis v. U.S. Gauge, 844 F. Supp. 1443, 1446-49 (D. Kan. 1994); Louisiana, Chevron USA v. Aker Maritime, Inc., 604 F.3d 888, 894-99 (5th Cir. 2010) (applying Louisiana law); Penn v. Inferno Mfg. Corp., 199 So. 2d 210, 215 (La. Ct. App. 1967); New Jersey, Slavin v. Francis H. Leggett & Co., 177 A. 120, 121 (N.J. Super. Ct. App. Div. 1935); New York, Andujar v. Sears Roebuck & Co., 597 N.Y.S.2d 78 (N.Y. App. Div. 1993); North Carolina, Warzynski v. Empire Comfort Sys., Inc., 401 S.E.2d 801 (N.C. Ct. App. 1991); Pennsylvania, Forry v. Gulf Oil Corp., 237 A.2d 593, 599 (Pa. 1968); Texas, Sears, Roebuck & Co. v. Black, 708 S.W.2d 925, 928 (Tex. App. 1986); Tennessee, Travelers Indem. Co. v. Indus. Paper & Packaging Corp., No. 3:02-cv-491, 2006 WL 2050686, at *4 (E.D. Tenn. July 19, 2006); Virginia, Carney v. Sears, Roebuck & Co., 309 F.2d 300, 304 (4th Cir. 1962) (applying Virginia law); and Wisconsin, Wojciuk v. U.S. Rubber Co., 108 N.W.2d 149, 152-53 (Wis. 1961).

The Court is persuaded that the North Dakota Supreme Court would likewise adopt the Restatement (Second) of Torts § 400. The North Dakota Supreme Court has previously adopted the provisions of the Restatement concerning strict liability in products liability actions and negligent

failure to warn. See Johnson v. Am. Motors Corp., 225 N.W.2d 57 (N.D. 1974); Collette v. Clausen, 667 N.W.2d 617 (N.D. 2003).

Courts are mixed as to whether the apparent manufacturer doctrine should be extended to a company that is neither the seller nor distributor of the product. See Yoder v. Honeywell Inc., 104 F.3d 1215 (10th Cir. 1997) (assuming that Colorado has adopted the Restatement (Second) of Torts § 400 and finding that the Colorado Supreme Court would likely not impose liability on a trademark owner) (applying Colorado law); Fletcher v. Atex, Inc., 68 F.3d 1451, 1462-64 (2d Cir. 1995) (finding that no New York court has ever found a company liable under the apparent manufacturer doctrine that neither sold nor distributed the product, and even if the apparent manufacturer could extend to such a company, the apparent manufacturer doctrine did not apply because the company's logo was not affixed to the product or its packaging (it was affixed only to promotional and advertising materials),  the materials did not suggest that the company was the manufacturer of the product, and the product displayed the name of the actual manufacturer) (applying New York law); Travelers Indem. Co., 2006 WL 2050686, at *4 ("The apparent manufacturer doctrine states that one who puts out as his own product a chattel by another is subject to the same liability as though he were the manufacturer.  'Hold out' (or 'puts out') usually involves either a defendant's labeling or affixing to the product its own name or putting forth advertising identifying the defendant as the maker of the product.") (internal citation omitted); Torres v. Goodyear Tire & Rubber Co., 867 F.2d 1234, 1236 (9th Cir. 1989) (finding that Arizona has not adopted the apparent manufacturer doctrine, but even if it did the doctrine would not apply because Goodyear was not the seller of the tire) (applying Arizona law); Sherman v. Sunsong Am., Inc., 485 F. Supp. 2d 1070, 1080 (D. Neb. 2007) (finding the apparent manufacturer doctrine inapplicable where the name of the company did not

9

appear on the product and there is no evidence that the plaintiffs relied on the brand name in choosing the product); Long v. U.S. Brass Corp., 333 F. Supp. 2d 999 (D. Colo. 2004) (finding the apparent manufacturer doctrine applicable where a company packaged and sold the product as its own, and the plaintiff could not have gleaned the actual manufacturer from looking at the product).

In this case, Diesel Machinery purchased the P-3000 from Dresser/Galion. The affidavit of David D. Nardo states that Tema Terra Maquinaria Ltda. is the actual manufacturer of the P-3000 at issue in this action. See Docket No. 6. However, neither the decals on the P-3000, the operator's manual, warranty materials, nor the sales brochure indicate that the compactor is manufactured by Tema Terra Maquinaria Ltda. Two decals are found on the compactor. The first decal indicates that the compactor was made in Brazil, but identifies it as a Galion product and provides the following address: Dresser Industries, Inc., Construction Equipment Division, Libertyville, IL. See Docket No. 21-6. The second decal also indicates that the compactor was made in Brazil, but identifies it as a Galion product and provides the following address: Galion Manufacturing Division, Dresser Industries, Inc., Galion, Ohio 44833.[5] See Docket No. 21-6. The operator's manual identifies the P-3000 as being a Dresser/Galion compactor without any indication that it was manufactured by Tema Terra Maquinaria Ltda. See Docket Nos. 21-7 and 21-8. The warranty materials for the P-3000 are for a Dresser product. See Docket No. 21-9. The P-3000 sales brochure displays the Dresser brand, and does not mention that the compactor was manufactured by Tema Terra Maquinaria Ltda. See Docket No. 21-5. Even Chris Case, the manager of Komatsu's engineering department, agreed that a person looking at the compactor and the owner's manual would get the

---

[5] In 1990, the Galion Ohio plant was in operation to manufacture Galion products, including motor graders and rollers. See Docket No. 21-11, p. 14.

impression that Dresser/Galion is the manufacturer of the P-3000.  See Docket No. 21-11, p. 13. The Plaintiff could not have gleaned from looking at the compactor, promotional and warranty materials, and the operator's manual that Tema Terra Maquinaria Ltda. was the manufacturer.

The Court finds that Komatsu, under its name at the time Komatsu Dresser, held itself as the manufacturer of the P-3000.  This is not merely a case where Komatsu is being held liable for trademarking its name on the compactor.  The P-3000's decals, brochure, operator's manual, and warranty information all support a finding that Komatsu represented to the public and others that it, and not Tema Terra Maquinaria Ltda., was the manufacturer of the P-3000 at issue in this case. Thus, the facts of this case warrant application of the apparent manufacturer doctrine.  Accordingly, the Court finds that Komatsu, as the apparent manufacturer of the P-3000, is a "manufacturer" under N.D.C.C. § 28-01.3-01(1).

With the manufacturer identified as Komatsu, Diesel Machinery argues that it is entitled to dismissal under N.D.C.C. § 28-01.3-04 as the non-manufacturing seller of the P-3000.  Section 28-01.3-04(1) provides:  "In any products liability action maintained against a seller of a product who did not manufacture the product, the seller shall upon answering or otherwise pleading file an affidavit certifying the correct identity of the manufacturer of the product allegedly causing the personal injury, death, or damage to property."  Diesel Machinery is a "seller"[6] and Komatsu is a "manufacturer" under N.D.C.C. § 28-01.3-01.  Pursuant to N.D.C.C. § 28-01.3-04(2), after the plaintiff files a complaint against the manufacturer and the manufacturer answers, the court shall dismiss the claims against the seller unless the plaintiff can show any of the following:

---

[6]  "Seller" means "any individual or entity, including a manufacturer, wholesaler, distributor, or retailer, who is engaged in the business of selling or leasing any product for resale, use, or consumption."  N.D.C.C. § 28-01.3-01(3).

a.       That the certifying seller exercised some significant control over the design or manufacture of the product, or provided instructions or warnings to the manufacturer relative to the alleged defect in the product which caused the personal injury, death, or damage to property.

b.       That the certifying seller had actual knowledge of the defect in the product which caused the personal injury, death, or damage to property.

c.       That the certifying seller created the defect in the product which caused the personal injury, death, or damage to property.

The Plaintiff argues that she can establish (a), (b), and (c).

The Plaintiff first argues that Diesel Machinery exercised significant control over the design and manufacture of the P-3000. The Plaintiff states,

> While [Diesel Machinery] was not responsible for the bulk of the design or manufacture of the P-3000, it nevertheless participated in both processes. Once [Diesel Machinery] received a P-3000 from Komatsu, and before [Diesel Machinery] could place the product on its sales lot, it had to perform several preparatory steps. First, a [Diesel Machinery] shop manager would check fluid levels, inspect the unit for damage, and possibly operate it around [Diesel Machinery's] yard to ensure that it was ready for use. (Don Mosey Dep. at 12:6-20.) Second, and critical to the point here, [Diesel Machinery] was the party responsible for ordering and installing ROPS for the P-3000, had it wanted to stock a P-3000 with ROPS or had a customer ordered one. (Brian Peranick Dep. at 17:24-19:7.) This process involves [Diesel Machinery's] shop employees welding parts of the ROPS structure directly to the P-3000, as it lacks appropriate mounting points when [Diesel Machinery] receives it from the factory. Id. at 25:24-26:19.

See Docket No. 26.

At the heart of the case is the fact that the P-3000 was manufactured and sold without a ROPS. It is undisputed that the P-3000 was delivered to Diesel Machinery without a ROPS, and that if Diesel Machinery or a customer had wanted a ROPS for the P-3000, Diesel Machinery was the party responsible for ordering and installing it. See Docket No. 23-2, p. 6. Accordingly, the Court finds that there are genuine issues of material fact as to whether Diesel Machinery's decision to stock the P-3000 without a ROPS is an element of its design; whether Diesel Machinery had actual

knowledge of the product defect; and whether it created the defect which caused the death.  Diesel Machinery is not entitled to dismissal under N.D.C.C. § 28-01.3-04.  Thus, the Court will consider the Plaintiff's claims in light of both Defendants.


**B.**     **STRICT PRODUCTS LIABILITY**

The Plaintiff alleges that "[r]ubber-tired roller compactors such as the P-3000 without a roll bar, roll cage, or other roll-over protection system are unreasonably dangerous to the user," and that manufacturing and/or selling the P-3000 without a ROPS was a proximate cause of Henry Reiss's fatal injuries.  See Docket No. 1-1.   "The doctrine of strict liability in tort imposes liability on the manufacturer or seller, or both, for injuries sustained as a result of a defective condition, unreasonably dangerous to a consumer or his property, or for failure to give adequate and proper warning."  Kaufman v. Meditec, Inc., 353 N.W.2d 297, 300 (N.D. 1984).  In order to recover under a strict products liability theory, (1) "the plaintiff must show by a preponderance of the evidence the product was defective in design or manufacture"; (2) "the defect rendered the product unreasonably dangerous to the consumer"; (3) "the defect existed when the product left the manufacturer"; and (4) "the defect was a proximate cause of the plaintiff's injuries."  Endresen v. Scheels Hardware & Sports Shop, Inc., 560 N.W.2d 225, 229 (N.D. 1997).

The North Dakota Century Code defines a "defective product" as follows:

No product may be considered to have a defect or to be in a defective condition, unless at the time the product was sold by the manufacturer or other initial seller, there was a defect or defective condition in the product which made the product unreasonably dangerous to the user or consumer.

N.D.C.C. § 28-01.3-06.

Of particular importance in North Dakota is the requirement that the defect render the product "unreasonably dangerous." Kaufman, 353 N.W.2d at 300. "Unreasonably dangerous" under North Dakota law means:

> the product is dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer, or user of that product in that community considering the product's characteristics, propensities, risks, dangers, and uses, together with any actual knowledge, training, or experience possessed by that particular buyer, user, or consumer.

N.D.C.C. § 28-01.3-01(4). Therefore, the Plaintiff is required to establish not only that the P-3000 had a defect that caused Henry Reiss's injuries but also that the defect rendered the P-3000 unreasonably dangerous at the time it left the manufacturer or seller. See Krosch v. JLG Indus., Inc., 590 F. Supp. 2d 1169, 1174 (D.N.D. 2008). "The mere fact that an accident or incident occurred, standing alone, does not support a claim that a product was defective." Burgad v. Jack L. Marcus, Inc., 345 F. Supp. 2d 1036, 1041 (D.N.D. 2004).

Under North Dakota law, there is a rebuttable presumption

> that a product is free from any defect or defective condition if the plans, designs, warnings, or instructions for the product or the methods and techniques of manufacturing, inspecting, and testing the product were in conformity with government standards established for that industry or if no government standards exist then with applicable industry standards, which were in existence at the time the plans, designs, warnings, or instructions for the product or the methods and techniques of manufacturing, inspecting, and testing the product were adopted.

N.D.C.C. § 28-01.3-09 (emphasis added).

A rebuttable presumption exists if the P-3000 was manufactured in conformance with government standards. The relevant standard in this case is 29 C.F.R. § 1926.1000 which governs ROPSs for compactors. The version of 29 C.F.R. § 1926.1000 in effect at the time the P-3000 was

manufactured required some machinery to have a ROPS, but reserved ruling on the issue concerning

compactors:

**Rollover protective structures (ROPS) for material handling equipment**

(a)    Coverage.

(a)(1)   This section applies to the following types of material handling equipment: To all rubber-tired, self-propelled scrapers, rubber-tired front-end loaders, rubber-tired dozers, wheel-type agricultural and industrial tractors, crawler tractors, crawler-type loaders, and motor graders, with or without attachments, that are used in construction work.  This requirement does not apply to sideboom pipelaying tractors.

(a)(2)   The promulgation of specific standards for rollover protective structures for compactors and rubber-tired skid-steer equipment is reserved pending consideration of standards currently being developed.

29 C.F.R. § 1926.1000(a)(1)-(2) (1989)[7] (emphasis added).  The language of 29 C.F.R. §

1926.1000(a)(1)-(2) makes clear that no government standards existed concerning ROPSs for rubber

tire roller compactors such as the P-3000.  When no government standards exist, there is a rebuttable

presumption against defects if the product is designed or manufactured in accordance with industry

standards.  N.D.C.C. § 28-01.3-09.

The Plaintiff alleges that the P-3000 was defective and unreasonably dangerous because it

was designed, manufactured, and sold without a ROPS.  In 1967, the United States Army Corps of

Engineers issued Safety-General Requirements which required steel canopies and seat belts on

_____

[7]  The language of the current version of 29 C.F.R. § 1926.1000 is unchanged from the 1989 version.

compactors.  Melvin L. Myers, <u>Compactor Overturns and Rollover Protective Structures</u>, CPWR – Center for Construction Research and Training (2004), *available at* http://www.elcosh.org/en/document/695/d000656/compactor-overturns-and-rollover-protective-structures.html.  In 1975, the Society of Automotive Engineers (SAE) recommended ROPSs on compactors.  <u>Id.</u>  In 1976, California issued safety regulations requiring ROPSs and seat belts on rollers and compactors.  <u>Id.</u>  In the 1980s, the United States Occupational Safety and Health Administration (OSHA) established a task force to develop ROPS requirements for compactors.  <u>Id.</u>  The OSHA task force "recommended that compactors be equipped with ROPSs, as specified in SAE Recommended Practice J1040 (1986); that ROPS be designed to support at least two times the weight applied at the point of impact; and seat belts meet SAE J386."  <u>Id.</u>  OSHA never promulgated the task force's recommendations into a rule.  <u>Id.</u>  In 1998, OSHA issued a guideline which recognized heavy equipment rollovers as a hazard and recognized that ROPSs and seat belts reduced this hazard.  <u>Id.</u>

Paul Stephens, a forensic engineer and the Plaintiff's expert witness, described the history of ROPS use by compactor manufacturers:

> In spite of compactor manufacturer awareness of the hazard in 1990 and prior years, most pneumatic compactor manufacturers only incorporated ROPS as standard equipment in the mid 1990's based on the writer's research to date.  For example, ROPS only was offered as optional equipment on Caterpillar's 1987 era model PS-100, 130 & 180 pneumatic compactors.  However, a successor model, the 150B pneumatic compactor that was sold from 1996 through at least 2002, featured ROPS as standard equipment.  The sales specification sheet for this particular model contained the following language:  "ROPS is standard equipment.  Caterpillar strongly recommends use of the ROPS on the PS-150B and PS-200B."

> ROPS also was not standard equipment on a Komatsu pneumatic compactor model JW30-1 built in 1992, a 1988 Bomag BW12R CON, and a 1989 Ingersoll-Rand PT140A.

16

The Hyster Company however provided ROPS as standard equipment on their 1988 and 1989 model C530A pneumatic compactors.  The Case Company provided ROPS as standard equipment on their 1990 model 602 B vibratory roller compactor as demonstrated by the content of their sales specification sheet.

See Docket No. 25-5, p. 8.

Despite the SAE recommending and California requiring ROPSs for compactors, most compactor manufacturers did not offer ROPSs as standard equipment until the mid 1990s.  Id.  The Court finds that the industry standard for compactors in 1990 was to provide ROPSs as optional equipment and not as standard equipment.  Accordingly, the rebuttable presumption under N.D.C.C. § 28-01.3-09 is inapplicable.

At issue is whether the absence of a ROPS as standard equipment was a defect which rendered the P-3000 unreasonably dangerous.  "As a general rule, a plaintiff is required to prove a product defect through an expert witness."  Burgad, 345 F. Supp. 2d at 1041.  Paul Stephens, in his expert report, states:

The opinions expressed in this report are based on my several decades of professional experience as a mechanical engineer, which includes 18 years evaluating accidents and their causes for attorneys or other personnel representing plaintiffs, defendants, and/or employers.  Such opinions are expressed within the bounds of reasonable engineering certainty and subject to change if additional information becomes available.  On this case my opinions are as follows:

• The Dresser model P3000 pneumatic compactor, absent a Rollover Protective Structure, was defective and not reasonably safe.

• The presence of a ROPS structure, in conjunction with seat belt use would have prevented Mr. Reiss from incurring fatal crush injuries.

• An evaluation of the adequacy of rollover hazard warnings, if any were provided on the compactor, is pending additional information.  If none were provided, the absence of manufacturer-provided rollover hazard-related warnings on the compactor was a design defect.

17

- The warning in the operator's manual was not sufficient to alert operator[s] to the rollover hazard. The absence of proper and complete manufacturer-provided rollover hazard-related warnings in the operator's manual was a design defect.

- Diesel Machinery's sales manager and sales personnel should have known that ROPS was available as optional equipment for the P3000 compactor but did not inform Mariner Construction that ROPS was an available option. Diesel Machinery, by not informing Mariner personnel of ROPS availability, failed to exercise the care that reasonable persons exercise in such circumstances. If Mariner Construction, having been informed of ROPS availability, would have purchased ROPS for the compactor involved in the incident, then Diesel Machinery's failure to exercise reasonable care was a proximate cause of the incident.

See Docket No. 25-5, pp. 13-14.

It is undisputed that at the time the P-3000 was sold to Mariner Construction in 1990, a ROPS could have been purchased from Saf-T-Cab as optional equipment. The P-3000 brochure and pricing sheet indicate that a ROPS is an optional attachment. See Docket Nos. 21-5 and 23-4. Richard Thompson, a former Diesel Machinery salesman who assisted Mariner Construction in leasing the P-3000, testified that he was unaware a ROPS was available as optional equipment:

| Q. [Counsel for the Plaintiff]: | Oh, I'm sorry. When you first talked to Art Mariner[8] about the P-3000 packer, did you show him the literature that you had? |
|---|---|
| A. [Richard Thompson]: | I normally carry a piece of literature in when they're looking for a specific piece of equipment and we generally go over what the specs are – |
| Q. [Counsel for the Plaintiff]: | Okay. |

---

[8] Art Mariner is the founder of Mariner Construction and was responsible for purchasing heavy construction equipment for Mariner Construction. See Docket No. 21-10, pp. 4-5 and Docket No. 23-7, p. 9.

18

| | |
|---|---|
| A. [Richard Thompson]: | – what the horsepower is, what the weight is, what the width is, different things like that. |
| . . . | |
| Q. [Counsel for the Plaintiff]: | Okay. Were you aware of the safety features available for the P-3000 packer? |
| A. [Richard Thompson]: | The only – the only feature I was aware of was the back-up alarm and the taillights. That was probably about the only thing. |
| . . . | |
| Q. [Counsel for the Plaintiff]: | Were you aware of a rollover protection system? |
| A. [Richard Thompson]: | No. |
| Q. [Counsel for the Plaintiff]: | And how about an after-market rollover protection system? |
| A. [Richard Thompson]: | No. |

See Docket No. 23-5, p. 3.

Mariner Construction leased the P-3000 in July 1990 and subsequently purchased it on December 31, 1990. See Docket Nos. 21-3 and 21-4. Art Mariner testified that he does not recall whether he saw a P-3000 brochure prior to purchasing the compactor, but states he "probably did." See Docket No. 21-10, p. 18. However, Art Mariner testified that he does not recall ever seeing the pricing sheet for the P-3000. See Docket No. 21-10, p. 22. Art Mariner further testified that he does not recall having any discussions with Diesel Machinery at the time he purchased the P-3000 about whether a ROPS could be added to the compactor. See Docket No. 21-10, p. 20. He assumed that the P-3000 did not come with a ROPS because the tire roller compactors that he had previously

owned did not come with one.  See Docket No. 21-10, p. 21.  Francis Schumacher, the shop foreman at Mariner Construction, testified that he looked at the compactor to determine if there were mounting brackets to install a ROPS and found none, and he looked in the operation and maintenance manual to determine if a ROPS could be purchased but the manual made no mention of a ROPS.  See Docket No. 23-6, p. 10.  He testified that beyond these actions, he made no further inquiries into determining whether a ROPS was available as optional equipment.  See Docket No. 23-6, pp. 10-11.

In Biss v. Tenneco, Inc., 409 N.Y.S.2d 874 (N.Y. App. Div. 1978), the New York Supreme Court, Appellate Division, considered whether the lack of a ROPS as standard equipment on a loader caused the machine to be defectively designed.  The court answered in the negative.  The court determined that "defendants had fulfilled their duty to exercise reasonable skill and care in designing the product as a matter of law when they advised the purchaser that an appropriate safety structure for the loader was available."  Biss, 409 N.Y.S.2d at 876.  The court stated,

> One of the dangers which may be apprehended in the use of construction equipment is injury from roll-over.  But that danger increases or lessens according to the job and site for which the equipment is purchased and used.  It is not a danger inherent in a properly constructed loader.  Neither is it a danger which the manufacturer alone may discover or one which is more favorably positioned to discover.  If knowledge of available safety options is brought home to the purchaser, the duty to exercise reasonable care in selecting those appropriate to the intended use rests upon him.  He is the party in the best position to exercise an intelligent judgment to make the trade-off between cost and function, and it is he who should bear the responsibility if the decision on optional safety equipment presents an unreasonable risk to users.  To hold otherwise casts the manufacturer and supplier in the role of insurers answerable to injured parties in any event, because the purchaser of the equipment for his own reasons, economic or otherwise, elects not to purchase available options to ensure safety.  The "legal responsibility, if any, for injury caused by machinery which has possible dangers incident to its use should be shouldered by the one in the best position to have eliminated those dangers."  In cases such as this, it is the purchaser who can best make the decision and he should bear the loss which results from his failure to do so.

Id. at 876-77 (internal citation omitted).

The Eighth Circuit Court of Appeals recognizes the ruling in Biss as generally sound, but failed to apply it in Wagner v. Int'l Harvester Co., 611 F.2d 224, 231 (8th Cir. 1979). In Wagner, the plaintiff sustained serious injuries when an International Harvester Company (IHC) Model 500C crawler tractor that he was driving rolled over. The crawler tractor did not have a ROPS. The plaintiff filed an action in federal court against the seller and manufacturer of the crawler tractor, alleging breach of warranty, negligence, and strict liability. The jury found the manufacturer negligent and determined that the crawler tractor was in a defective condition when it left the manufacturer's control because it was not equipped with a ROPS as standard equipment. On appeal, the Eighth Circuit considered whether the crawler tractor was unreasonably dangerous in light of the ruling in Biss:

> Lastly, IHC argues that it fully satisfied its duty of reasonable care by making rollover protection available and advertising it as optional equipment. See Biss v. Tenneco, Inc., 409 N.Y.S.2d 874 (1978). Contra, Robinson v. Int'l Harvester Co., 358 N.E.2d 317 (1976), rev'd on other grounds, 374 N.E.2d 458 (1978). According to this theory, the purchaser of multi-use equipment knows best the dangers associated with its particular use, and so it should determine the degree of safety provided. That is to say, the purchaser may be in the best position to make the cost-benefit analysis implicit in the principles of general negligence. Imposing liability on such a purchaser would result in minimizing the sum of accident and preventive costs.

> While we accept this theory as basically sound, the facts of this case do not support its application here. In 1971, IHC did not offer a rollover protective structure satisfying Society of Automotive Engineers (SAE) standards as optional equipment on the 500C. IHC did offer as an optional item a so-called ESCO canopy, which apparently would survive rollovers. However, IHC advertised that canopy as a device providing overhead protection in the timber industry; the ESCO canopy in 1971 was neither tested nor marketed for rollover protection. It is unrealistic to expect a 1971 purchaser of the 500C to know that overhead protection and rollover protection were both incorporated in the ESCO canopy, and it would be inappropriate to impose liability on such a purchaser.

21

> In sum, appellee Wagner presented testimony of expert witnesses together with other evidence from which the jury could conclude that IHC was negligent and the 500C crawler defective because it was sold without rollover protection.

Wagner, 611 F.2d at 231.

In the present case, a ROPS which met SAE standards had been designed, tested, and built for the P-3000 by 1986. See Docket No. 23-2, p. 4. However, no one has testified that Mariner Construction was aware of the option to purchase a ROPS and made a conscious decision to not do so. Art Mariner is unsure whether he obtained a brochure from Richard Thompson, and does not ever recall seeing a pricing sheet for the P-3000. See Docket No. 21-10, pp. 18 and 22. Richard Thompson testified that it was his normal practice to carry literature on the machines, but was unaware that a ROPS could be purchased as optional equipment for the P-3000. See Docket No. 23-5, p. 3. More important, the P-3000 was designed without attached mounting brackets and, therefore, one could not glean from looking at the P-3000 that a ROPS was available as optional equipment.

The P-3000 at issue in this case was leased and purchased twenty years ago in 1990. Due to the duration of time, memories have faded and relevant documents have been lost.[9] No one

---

[9] Art Mariner testified that he did not have an independent recollection of purchasing the P-3000, nor did he keep a record of the purchase:

| Q. [Counsel for Komatsu]: | So we have the documents going way back to 1989 and 1990. What I've marked here are some documents here that you had signed when the machine was purchased. Before I show you those, do you have any independent recollection of purchasing this Dresser roller that was involved in the accident? |
|---|---|
| A. [Art Mariner]: | No. We – I even had the girls look to see if we had copies, and we didn't have nothing on it to show when we bought it, so – |

See Docket No. 21-10, pp. 10-11.

knows exactly what safety features Art Mariner and Richard Thompson discussed and whether a brochure and/or pricing sheet were provided to Art Mariner prior to Mariner Construction leasing and purchasing the P-3000.  Thus, unlike in <u>Biss</u>, there is a genuine issue of material fact as to whether the purchaser, Mariner Construction, was aware of the option to purchase a ROPS and made the conscious decision to not do so.

Nonetheless, Komatsu argues the Plaintiff is unable to establish that the lack of a ROPS was a defect which rendered the P-3000 unreasonably dangerous under North Dakota law.  Pursuant to N.D.C.C. § 28-01.3-01(4), an unreasonably dangerous product is a product that is "dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer, or user of that product in that community considering the product's characteristics, propensities, risks, dangers, and uses, together with any actual knowledge, training, or experience possessed by that particular buyer, user, or consumer."  Komatsu argues that Mariner Construction's employees did not consider the P-3000 to be unreasonably dangerous and were warned to not drive too close to the edge of the road.

Greg Mariner of Mariner Construction testified that he did not consider the P-3000 to be dangerous if used properly:

| | |
|---|---|
| Q. [Counsel for Komatsu]: | Okay.  Did you personally consider rubber tired rollers – excuse me – rubber tired rollers to be a major rollover hazard if they were operated properly? |
| A. [Greg Mariner]: | No, I did not. |
| Q. [Counsel for Komatsu]: | Why not? |
| A. [Greg Mariner]: | If – if you keep them on the flat and – and on a safe surface, you – they're |

|  |  |
|---|---|
|  | not going to roll over. So if they're actually rolling the road on the surface of the road and not trying to roll the ditches or the shoulder and get off the surface of the road, to me they're not dangerous. To me they're not. |
| Q. [Counsel for Komatsu]: | Okay. |
| A. [Greg Mariner]: | But if you try rolling a soft shoulder with them, to me they're not designed for that. You know, the padfoots are designed to build the road, create the surface, and when we put the gravel on, we use the rubber tire roller on the surface and we keep it on the flat. And I've seen people try and roll the slough of the road with them and, you know, that's where we explain to them, keep it on a flat surface. The only time you'd have a problem is if the road was soft and you got close to the soft shoulder to where it would, you know, lean on you a little bit. |

See Docket No. 23-7, p. 13.

Darryl Mortenson, a heavy equipment operator for Mariner Construction, testified as to the training he received before operating a tire roller compactor:

|  |  |
|---|---|
| Q. [Counsel for Komatsu]: | Okay. During your tenure there or your working at Mariner before Mr. Reiss's accident, did they have periodic training for heavy equipment operators? |
| A. [Darryl Mortenson]: | Yeah. I mean, when you learn how to run them, you know, they would show you. For me, I guess, all the stuff that I got on, I didn't know how to run it so they showed me how, the bosses or the foremen or somebody showed me how to run the stuff and I guess that |

|  | was my training, you know, the extent. |
|---|---|
| Q. [Counsel for Komatsu]: | Okay. So it would be somebody at the jobsite that would show you? |
| A. [Darryl Mortenson]: | Right. |
| Q. [Counsel for Komatsu]: | Other than that, did they have any periodic training sessions to emphasize certain things like safety and the use of certain pieces of equipment or anything like that? |
| A. [Darryl Mortenson]: | We do now. I'm not sure. I guess I think we did, but I'm not going to say for sure. |
| Q. [Counsel for Komatsu]: | Okay. Do you remember prior – |
|  | Mr. Reiss's accident was in 2006, September of 2006. Do you remember prior to that accident whether there had been any safety training sessions in regard to the use of compactors? |
| A. [Darryl Mortenson]: | I'm not sure. How do I want to say it? When they give safety training on this, I mean, they cover more – they cover just about all the equipment. I mean, it's not just specified as one piece of equipment, you know, it's the use of seat belts, stuff like that. |

. . .

| Q. [Counsel for Komatsu]: | All right. So before you started to operate those compactors, what training did you receive? |
| A. [Darryl Mortenson]: | The boss just showed me how to run it, told me what to do and what not to do as far as where to roll, like roads, |

25

|  | stay off the edge of roads. They've got other pieces of equipment that will go out on the edge of the road, stuff like that. |
|---|---|
| Q. [Counsel for Komatsu]: | Okay. So when you got your training from the bosses on operating compactors, they told you not to go too close to the edge of the road? |
| A. [Darryl Mortenson]: | Yep. Stay a safe distance away so that – just in case something gives way, just because of that reason, so they don't tip over. |
| Q. [Counsel for Komatsu]: | And you think that training was prior to Mr. Reiss's accident? |
| A. [Darryl Mortenson]: | Oh, yeah. |
| Q. [Counsel for Komatsu]: | Do you know why they recommended that you don't operate the compactor too close to the edge of the road? |
| A. [Darryl Mortenson]: | Yeah, so it don't – if you hit a soft spot or something or the side of the road gives way, it's going to pull you in the ditch, going to tip you over. |

See Docket No. 23-8, pp. 5-6.

Greg Mariner testified that Mariner Construction employees were warned to not operate heavy equipment near the edge of the road:

| Q. [Counsel for Komatsu]: | Okay. I've marked pages from [Darryl Mortenson's] deposition as Deposition Exhibit 11 here, which actually encompasses pages 12 through 15 – actually 12 through 19 and then 20 through 23. I might just ask you to look at that, the portions I've highlighted starting here and just read through about what Mr. |
|---|---|

26

|  |  |
|---|---|
|  | Mortenson told us about your instructions to employees about the use of the rubber tired rollers. |
| A. [Greg Mariner]: | Okay. |
| Q. [Counsel for Komatsu]: | And it goes on for several pages, but what he told us, if I'm remembering his testimony correctly, basically he indicated that the compactor operators or the roller operators for Mariner were instructed not to get too close to the edge of the road because the compactors might tip over.  Is that true?  Was that the training they were given? |
| A. [Greg Mariner]: | Yes.  We'd tell them to keep them on a flat, stable surface. |
| Q. [Counsel for Komatsu]: | Okay.  And apparently they – that was emphasized pretty heavily to them, according to Mr. Mortenson, that that could be a hazard if they got too close to the edge of the road which might have an unstable surface to it. |
| A. [Greg Mariner]: | Yes.  It has been brought up in safety meetings for – for the reason that they're top-heavy rollers.  You know, they're higher and all the weight's toward the top, so they seem to be unstable if you get them off the edge of the road. |

. . .

|  |  |
|---|---|
| Q. [Counsel for Komatsu]: | When you say there has been training in that regard, was that – did that training take place before Mr. Reiss's accident? |
| A. [Greg Mariner]: | Yes.   We've   talked about it throughout all the years we've had |

27

|  |  |
|---|---|
|  | rubber tire rollers in the mornings, you know. Even out on the jobsites, if we go to any jobsites, we're always telling the guys use a different compactor or equipment to – if the shoulders are soft to get that done before we roll the gravel for the top surface. |
| Q. [Counsel for Komatsu]: | Okay. Was Mr. Reiss involved in those training sessions, do you believe? |
| A. [Greg Mariner]: | When we've talked about – in our safety meetings we've done them on Monday mornings where everybody that worked for the company would be there. |
| Q. [Counsel for Komatsu]: | So is it your belief that Mr. Reiss would have received that training and instruction from Mariner Construction prior to his accident? |
| A. [Greg Mariner]: | Yes. It was common that everybody meets in the shop in the morning – Monday mornings at the same time. And that's usually when they had the – what do you call them, lunch-pail safety meetings where you go over a certain topic every time you have one. |

See Docket No. 23-7, pp. 13-14.

Art Mariner testified that in his many years of owning a road construction business, he does not recall any employee other than Henry Reiss being injured in a rollover incident:

|  |  |
|---|---|
| Q. [Counsel for Komatsu]: | To the best of your knowledge, Art, over the many years you've been operating now either in the excavation business or the road construction business, have you ever had anyone injured in a rollover accident of any |

28

|  | kind other than Mr. Reiss, to the best of your knowledge, on any kind of equipment, whether it be any – on any piece of equipment? |
|---|---|
| A. [Art Mariner]: | Nope, none that I can remember. |
| Q. [Counsel for Komatsu]: | And that goes all the way back to the 1960s? |
| A. [Art Mariner]: | (Nods head.) |
| . . . | |
| Q. [Counsel for Komatsu]: | No other injuries? |
| A. [Art Mariner]: | No. |

See Docket No. 21-10, pp. 36-37.

It is undisputed that Mariner Construction instructed its employees to not drive rubber tire roller compactors near the edge of the road. Mariner Construction employees were aware that rubber tire roller compactors such as the P-3000 have a tendency to roll over if driven too close to the edge of the road. However, none of Mariner Construction's employees testified that serious injury or death could result from a rollover. Art Mariner testified that Henry Reiss was the only employee who had suffered injuries from a heavy equipment rollover. See Docket No. 21-10, pp. 36-37. Even Francis Schumacher, who rolled the P-3000 the day it was delivered to Mariner Construction, escaped injuries by jumping clear of the compactor as it rolled. See Docket No. 23-6, p. 5. Accordingly, the Court finds that there are genuine issues of material fact as to whether Mariner Construction, its employees, or even Henry Reiss, an experienced heavy equipment operator, was aware of the seriousness of the dangers of rollover hazards. The Court finds that there are genuine issues of material fact as to whether the lack of a ROPS is a defect which rendered the

29

P-3000 unreasonably dangerous, or dangerous to an extent beyond which was contemplated by the ordinary and prudent buyer or user and beyond that contemplated by Mariner Construction, its employees, or Henry Reiss.

In order to recover under a strict products liability theory, (1) "the plaintiff must show by a preponderance of the evidence the product was defective in design or manufacture"; (2) "the defect rendered the product unreasonably dangerous to the consumer"; (3) "the defect existed when the product left the manufacturer"; and (4) "the defect was a proximate cause of the plaintiff's injuries." Endresen, 560 N.W.2d at 229.  The Court has determined that there are genuine issues of material fact as to (1) whether the lack of a ROPS is a defect which (2) rendered the P-3000 unreasonably dangerous.  Komatsu argues that the P-3000 was manufactured with a ROPS because a ROPS could be purchased as optional equipment.  However, the Court has found that there are genuine issues of material fact as to whether Mariner Construction was aware that a ROPS was available for purchase. Further, if Mariner Construction had been interested in purchasing a ROPS for the P-3000, Brian Peranick of Saf-T-Cab agreed "there would be at least about a five week delay between a dealership ordering a ROPS in North Dakota and having it installed" on the P-3000.  See Docket No. 23-2, p. 8.  Moreover, the Plaintiff's expert, Paul Stephens, has rendered opinions that Henry Reiss's injuries were proximately caused by the lack of a seat belt and ROPS.  See Docket No. 25-5, p. 13.[10] Accordingly, the Court finds that there are genuine issues of material fact as to whether the Defendants are liable under a strict products liability theory for manufacturing and/or selling the P-3000 without an attached ROPS.  Summary judgment is denied on this claim.

---

[10]  It is well-established that expert testimony is needed to prevail on a strict liability claim.  See Dancy v. Hyster Co., 127 F.3d 649 (8th Cir. 1997).

### C.     <u>FAILURE TO WARN</u>

The Plaintiff alleges the Defendants had a duty to warn purchasers, users, and suppliers of the dangers of operating the P-3000 without a ROPS and failed to warn about these dangers at the time of manufacture and at the time of the discovery of the danger. <u>See</u> Docket No. 1-1. The operator's manual and operation and maintenance manual include the following warning: "**KNOW** your work area. Use extreme caution on uneven terrain." <u>See</u> Docket Nos. 21-7, p. 3 and 25-9, p. 3 (emphasis in originals). The Plaintiff contends that this warning is insufficient to warn that rollovers may occur on all types of terrain and that death may result from a rollover.

Failure to warn claims in North Dakota may be based on negligence and strict liability. <u>Krosch v. JLG Indus., Inc.</u>, 590 F. Supp. 2d 1169 (D.N.D. 2008). The Plaintiff's responses to the Defendants' summary judgment motions reference only negligent failure to warn causes of action. Therefore, the Court will construe the Plaintiff's failure to warn claims solely under negligence principles, and not under principles of strict liability.

In North Dakota, a negligent failure to warn cause of action is based on the principles set forth in the Restatement (Second) of Torts § 388 (1965). <u>Id.</u> at 1176-77. Section 388 provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a)     knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b)     has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c)     fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Section 388 applies not only to the manufacturers of a product but also to the suppliers.[11]   In order to establish a claim for negligent failure to warn, the Plaintiff must satisfy all three subsections under Section 388.  <u>Collette v. Clausen</u>, 667 N.W.2d 617, 624 (N.D. 2003).  Comment g to Section 388 explains that the duty imposed on "the supplier of a chattel for another's use is to exercise reasonable care to give to those who are to use the chattel the information which the supplier possesses, and which he should realize to be necessary to make its use safe for them and those in whose vicinity it is to be used."  The existence of a duty to warn is generally a preliminary question of law for the court, but if the existence of a duty depends upon factual determinations, their resolution must be resolved by the trier of fact.  <u>Kappenman v. Klipfel</u>, 765 N.W.2d 716, 720 (N.D. 2009).

### 1)      <u>FAILURE TO WARN AT THE TIME OF MANUFACTURE</u>

The Plaintiff alleges that the "Defendants had a duty to warn purchasers, users, or potential users of the P-3000 about the dangers of operating it without a roll-over protection system" at the time of manufacture.  <u>See</u> Docket No. 1-1.  The existence of a duty to warn depends upon a determination of whether the Defendants knew or had reason to know that the P-3000 was likely to be dangerous for the use for which it was supplied, had no reason to believe that those who would

---

[11]   Comment c to Restatement (Second) of Torts § 388 defines "supplier":

The rules stated in this Section and throughout this Topic apply to determine the liability of any person who for any purpose or in any manner gives possession of a chattel for another's use, or who permits another to use or occupy it while it is in his own possession or control, without disclosing his knowledge that the chattel is dangerous for the use for which it is supplied or for which it is permitted to be used.  These rules, therefore, apply to sellers, lessors, donors, or lenders, irrespective of whether the chattel is made by them or by a third person.

use the P-3000 would realize its dangerous condition, and failed to exercise reasonable care in informing users of the P-3000's dangerous condition.  <u>See</u> Restatement (Second) of Torts § 388.[12]

First, the Defendants knew that there was at least some risk in operating the P-3000 without a ROPS.  The evidence establishes that the operator's manual and operation and maintenance manual provided the following warning concerning the operation of the P-3000:  "**KNOW** your work area.  Use extreme caution on uneven terrain."  <u>See</u> Docket Nos. 21-7, p. 3 and 25-9, p. 3 (emphasis in originals).  Paul Stephens's expert report indicates that long before the P-3000 was sold to Mariner Construction in 1990, industry and OSHA studies concluded that ROPSs reduced compactor rollover fatality rates.  <u>See</u> Docket No. 25-5, pp. 6-7.  The Defendants have not alleged that they were unaware of the dangers of operating the P-3000 without a ROPS.

Second, the Defendants argue that the dangers of operating the P-3000 without a ROPS were open and obvious, especially to an experienced heavy equipment operator like Henry Reiss.

> Since "[t]he duty to warn others of a particular peril is not absolute," the necessity to warn
>
> > depends, among other things, upon the age, intelligence, and information of those to whom the warning might be due.  There is no duty to warn someone who has actual notice and appreciation of the danger.  There is no duty to warn of commonly known risks, and no duty to warn of dangers already understood and appreciated.  There is no duty to warn of the obvious.

<u>Collette</u>, 667 N.W.2d at 625 (quoting 57A Am. Jur. 2d <u>Negligence</u> § 388 (1989) (footnotes omitted)).

---

[12]  It is undisputed the first two prerequisites under Section 388 are met, that:  (1) Komatsu supplied the P-3000 to Diesel Machinery which, in turn, supplied the P-3000 to Mariner Construction and that Mariner Construction's employees, including Henry Reiss, were among those expected by Komatsu to use the P-3000 with Mariner Construction's consent; and (2) the harm involved in this action was physical in nature.

Darryl Mortenson testified that the dangers of driving compactors too close to the edge of the road were commonly known among Mariner Construction employees:

| | |
|---|---|
| Q. [Counsel for Komatsu]: | Okay.  So when you got your training from the bosses on operating compactors, they told you not to go too close to the edge of the road? |
| A. [Darryl Mortenson]: | Yep.  Stay a safe distance away so that – just in case something gives way, just because of that reason, so they don't tip over. |
| Q. [Counsel for Komatsu]: | And you think that training was prior to Mr. Reiss's accident? |
| A. [Darryl Mortenson]: | Oh, yeah. |
| Q. [Counsel for Komatsu]: | Do you know why they recommended that you don't operate the compactor too close to the edge of the road? |
| A. [Darryl Mortenson]: | Yeah, so it don't – if you hit a soft spot or something or the side of the road gives way, it's going to pull you in the ditch, going to tip you over. |

. . .

| | |
|---|---|
| Q. [Counsel for Komatsu]: | Okay.  Was that common knowledge to the heavy equipment operators at Mariner that you didn't operate the compactors too close to the edge of the road? |
| A. [Darryl Mortenson]: | Yes, it was. |
| Q. [Counsel for Komatsu]: | Because of the rollover danger? |
| A. [Darryl Mortenson]: | Right. |

. . .

| Q. [Counsel for Komatsu]: | Okay.  And so based upon the training and warnings you got on the compactor, how close was too close to the edge of the road? |
|---|---|
| A. [Darryl Mortenson]: | Oh, we've been told to stay at least a foot and a half to two feet away from the edge. |
| Q. [Counsel for Komatsu]: | All right.  And that was Greg Mariner that told you that, as well? |
| A. [Darryl Mortenson]: | Yep. |
| Q. [Counsel for Komatsu]: | And was that – do you think that was common knowledge among the heavy equipment operators at Mariner? |
| A. [Darryl Mortenson]: | Yes, it was, as far as I know. |

See Docket No. 23-8, pp. 6-8

Greg Mariner testified that Henry Reiss received training from Mariner Construction to not operate rubber tire roller compactors too close to the edge of the road:

| Q. [Counsel for Komatsu]: | Okay.    Now, we've taken the deposition of – of the employee who was out – the Mariner employee who was out at the project at the time of Mr. Reiss's accident.  His name is Darryl Mortenson.  And I had sent you a  copy  of  Darryl  Mortenson's deposition  before  you  came  here today.  Were you able to look at that at all? |
|---|---|
| A. [Greg Mariner]: | Yes.  I went over it I think it was a week and a half ago. |

. . .

Q. [Counsel for Komatsu]:    And it goes on for several pages, but what he told us, if I'm remembering his testimony correctly, basically he indicated that the compactor operators or the roller operators for Mariner were instructed not to get too close to the edge of the road because the compactors might tip over.  Is that true?  Was that the training they were given?

A. [Greg Mariner]:    Yes.  We'd tell them to keep them on a flat, stable surface.

Q. [Counsel for Komatsu]:    Okay.  And apparently they – that was emphasized pretty heavily to them, according to Mr. Mortenson, that that could be a hazard if they got too close to the edge of the road which might have an unstable surface on it.

A. [Greg Mariner]:    Yes.  It has been brought up in safety meetings for – for the reason that they're top-heavy rollers.  You know, they're higher and all the weight's toward the top, so they seem to be unstable if you get them off the edge of the road.

. . .

Q. [Counsel for Komatsu]:    When you say there has been training in that regard, was that – did that training take place before Mr. Reiss's accident?

A. [Greg Mariner]:    Yes.    We've  talked about it throughout all the years we've had rubber tire rollers in the mornings, you know.  Even out on the jobsites, if we go to any jobsites, we're always telling the guys use a different compactor or equipment to – if the shoulders are soft to get that done

36

|  |  |
|---|---|
|  | before we roll the gravel for the top surface. |
| Q. [Counsel for Komatsu]: | Okay.  Was Mr. Reiss involved in those training sessions, do you believe? |
| A. [Greg Mariner]: | When we've talked about – in our safety meetings we've done them on Monday mornings where everybody that worked for the company would be there. |
| Q. [Counsel for Komatsu]: | So is it your belief that Mr. Reiss would have received that training and instruction from Mariner Construction prior to his accident? |
| A. [Greg Mariner]: | Yes.  It was common that everybody meets in the shop in the morning – Monday mornings at the same time. And that's usually when they had the – what do they call them, lunch-pail safety meetings where you go over a certain topic every time you have one. |

See Docket No. 23-7, pp. 13-14.

Art Mariner also testified that Mariner Construction warned its employees about the proper

use of rubber tire roller compactors:

|  |  |
|---|---|
| Q. [Counsel for Komatsu]: | All right.  So when you – when you would operate this rubber tired roller involved in the accident with Mr. Reiss, would you take any precautions about how close you got to the edge of the road? |
| A. [Art Mariner]: | We always told everybody to stay a couple feet away from the shoulder. |
| Q. [Counsel for Komatsu]: | And why was that? |

| | |
|---|---|
| A. [Art Mariner]: | Well, because it's – it's like any other thing when it overcenters, it's – you know, if you get overcentered, it will go over because the wheels are solid, you know.  They don't – the front wheels flex, but the back wheels are solid.  So as soon as you're over center, you can go. |
| Q. [Counsel for Komatsu]: | Was that true with all of the rubber tired rollers that you've owned over the years? |
| A. [Art Mariner]: | Every one I've had. |
| Q. [Counsel for Komatsu]: | Okay.  And is that even true with the ones that have rollover protection structures on them? |
| A. [Art Mariner]: | Yes.  Kind of the nature of them. |

See Docket No. 21-10, pp. 30-31.

Komatsu argues that the testimony of Mariner Construction's employees establishes they were aware that rubber tire roller compactors, such as the P-3000, have a tendency to tip or roll over if driven too close to the edge of the road.  Mariner Construction held safety meetings weekly to discuss specific safety topics, including the use of rubber tire roller compactors.  Mariner Construction is an experienced construction company that has surfaced roads using rubber tire roller compactors since the 1970s.  See Docket No. 21-10, pp. 5-7.  Although Mariner Construction's employees testified that they were aware the P-3000 had a propensity to tip and roll over if driven too close to the edge of the road, no employee expressed an awareness that a rollover could occur on all types of terrain and result in serious injury or death.  Francis Schumacher testified that he rolled the P-3000 the day it was delivered to Mariner Construction, jumped freely from the compactor, and did not suffer any injuries.  See Docket No. 23-6, p. 5.

The duty to warn is based on the premise that individuals who have superior knowledge of a chattel must warn those who lack similar knowledge of the chattel's dangers.  <u>Collette</u>, 667 N.W.2d at 627.  Paul Stephens's expert report indicates that manufacturers of compactors were aware of compactor rollover hazards as early as 1971.  <u>See</u> Docket No. 25-5, p. 6.  Nonetheless, the only relevant warning in P-3000 literature was "**KNOW** your work area.  Use extreme caution on uneven terrain."  <u>See</u> Docket Nos. 21-7, p. 3 and 25-9, p. 3 (emphasis in originals).

The Court finds that there are genuine issues of material fact as to whether the warning in the operator's manual and operation and maintenance manual was adequate to inform Henry Reiss of the P-3000's arguably dangerous condition, given the vagueness of the warning; the testimony of Mariner Construction employees that they were warned to not drive rubber tire roller compactors near the edge of the road; Henry Reiss's extensive experience in operating heavy equipment; the testimony of Art Mariner that Henry Reiss is the only Mariner employee to suffer injuries from a heavy equipment rollover; the fact that Francis Schumacher rolled the P-3000 the day it was delivered to Mariner Construction, jumped freely from the compactor, and suffered no injuries; and Paul Stephens's expert report which indicates that compactor manufacturers were aware of rollover hazards and the benefits of using ROPSs to prevent fatalities well before 1990.  Based on the evidence presented by the parties, the Court finds that reasonable minds could differ as to the adequacy of the warning in the manuals.  Accordingly, the adequacy of the warning should be left to the determination of the jury at trial.  Summary judgment is denied on the negligent failure to warn at the time of manufacture claim.

### 2)   <u>FAILURE TO WARN AT THE TIME OF DISCOVERY OF DANGER</u>

The Plaintiff also alleges that the Defendants had a duty to warn owners or users of the P-3000 when the dangers were discovered.  The North Dakota Supreme Court has recognized a post-sale duty to warn under negligence principles.  <u>See</u> <u>Crowston v. Goodyear Tire & Rubber Co.</u>, 521 N.W.2d 401, 407 (N.D. 1994).  A post-sale duty to warn exists "if, subsequent to the sale of a product, manufacturers become aware of dangerous conditions associated with the use of the product."  <u>Id.</u>  A manufacturer which mass produces a product cannot ignore post-sale knowledge about the dangers associated the use of its product even if the specific purchasers cannot be reasonably traced.  <u>Id.</u> at 408.  "Simply because a product is mass produced and widely distributed does not totally absolve a manufacturer of a post-sale duty to warn under ordinary negligence principles."  <u>Id.</u>

In determining that the defendant manufacturers of a tire and wheel owed a post-sale duty to warn customers of the dangerous condition of the tire/wheel assembly, the North Dakota Supreme Court considered the seriousness of the injury, when the manufacturers became aware of the dangers, the number of individuals exposed to the potential dangers, and the number of products produced.  <u>See</u> <u>id.</u> at 409.  Even though the tire and wheel were mass produced, the court determined that the seriousness of the injury (tire explosions during inflation) and the potentially large number of individuals exposed to the danger presented "special" circumstances to create a duty to take reasonable steps to warn users about the dangers associated with its product post-sale.  The court stated, "Although the number of this type of products produced militates against individualized notice to the original purchasers, that same factor suggests that manufacturers cannot totally ignore post-sale information which has the potential to prevent serious injury to so many people."  <u>Id.</u>

In this case, it is clear that the potential injury from a P-3000 rollover without a ROPS is serious injury or death.  Paul Stephens's expert report indicates that compactor rollovers can occur on all types of terrain.  See Docket No. 25-5, p. 7.  The record is devoid of any evidence relating to the number of P-3000 pneumatic rubber tire roller compactors that were produced without a ROPS as standard equipment.  Nonetheless, Komatsu has not argued that it would be impossible, or even difficult, to trace the retailers that sold the Galion Dresser P-3000, and Diesel Machinery kept records of each piece of machinery it sold (including the P-3000) as a general business practice.  See Docket No. 21-12, pp. 34-35.  Accordingly, the Court finds that there are genuine issues of material fact under Crowston as to whether a post-sale duty to warn was created.  Summary judgment is denied on this claim.

### D.      NEGLIGENCE

The Plaintiff alleges that the "Defendants had a duty to design or manufacture the P-3000 to be free of the dangers of operating it without a roll-over protection system."  See Docket No. 1-1. In a negligence action, the plaintiff must establish:  (1) duty, (2) breach of duty, (3) causation, and (4) damages.  Barbie v. Minko Constr., Inc., 766 N.W.2d 458, 461 (N.D. 2009).  "In negligent design claims it is well established that a manufacturer or seller is not liable in the absence of proof that a product is defective.  Thus, an element of a negligent design case is that the product is defective or unsafe."  Oanes v. Westgo, Inc., 476 N.W.2d 248, 253 (N.D. 1991) (internal citations omitted).  To establish negligence, the Plaintiff must prove that the Defendants failed to use reasonable care in designing the product and that the failure resulted in a defective product.  See id. However, summary judgment is generally not appropriate to resolve negligence actions because they

involve questions of fact.  Botner v. Bismarck Parks & Recreation Dist., 782 N.W.2d 662, 665 (N.D. 2010).

The Court has determined that there are genuine issues of material fact as to whether Mariner Construction was aware that a ROPS was available as optional equipment.  Komatsu has cited the following cases in support of its position that the P-3000 is free of unreasonable design defects: Jackson v. Bomag GmbH, 638 N.Y.S.2d 819, 822-23 (N.Y. App. Div. 1996) (finding that the lack of a ROPS as standard equipment on a static roller did not constitute a design defect because the purchaser was aware of the option to purchase the ROPS and made a conscious decision to not do so); Morrison v. Kubota Tractor Corp., 891 S.W.2d 422, 427-28 (Mo. Ct. App. 1994) (finding that the lack of a ROPS on a tractor did not constitute a design defect where a ROPS was standard equipment subject to a delete order because the operator's manual recommended a ROPS for most applications, the plaintiff was an experienced tractor operator who was aware of the dangers of operating the tractor without a ROPS, the plaintiff was aware that the tractor lacked a ROPS, and the dangers of operating a tractor without a ROPS were open and obvious); Boyd v. S.E. Johnson Co., No. 11-01-01, 2001 WL 1031419, at *5 (Ohio Ct. App. Sept. 10, 2001) (finding that the lack of a ROPS on an asphalt roller did not constitute a design defect where a ROPS was standard equipment subject to a delete order because roller operators had a propensity to not wear seat belts which increased the hazards of using a ROPS, the presence of a ROPS increased the possibility that the roller would tip when on a slope, an attached ROPS would reduce access and egress in emergency situations and would reduce maneuverability and clearance, and there were no government standards in place requiring manufacturers to attach a ROPS to asphalt rollers).

The Court finds that the cases cited by Komatsu are distinguishable.  First, the Court has determined that there are genuine issues of material fact as to whether Mariner Construction was aware of the option to purchase a ROPS for the P-3000.  Second, Dresser/Galion did not provide a ROPS as standard equipment subject to a delete order.  Third, the record is devoid of any evidence that the P-3000, with an attached ROPS, would reduce access and egress in emergency situations, would reduce maneuverability and clearance, and would increase the likelihood that the P-3000 would tip; or that Mariner Construction employees have a propensity to not wear seat belts when using heavy machinery with an attached ROPS.[13]

Paul Stepens's expert report indicates that the use of a ROPS reduces injuries and fatalities from vehicle rollovers, and that ROPS designs were available for most heavy construction equipment manufactured after 1960.  See Docket No. 25-5, p. 7.  Stephens's report also indicates that compactor manufacturers were aware of rollover hazards and the benefits of using a ROPS to prevent compactor operator injury well before 1990.  See id.  Further, Brian Peranick of Saf-T-Cab agreed that "there would be at least about a five week delay between a dealership ordering a ROPS in North Dakota and having it installed" on the P-3000.  See Docket No. 23-2, p. 8.

The Court finds that there are genuine issues of material fact as to whether the Defendants were negligent in designing and/or manufacturing the P-3000 without a ROPS under the circumstances.  Questions remain concerning whether Mariner Construction was aware that a ROPS was available as optional equipment and whether the dangers of operating the P-3000 without a ROPS were known to Mariner Construction's employees.  Viewed in the light most favorable to the

---

[13]  Art Mariner testified that if a machine had a roll cage, Mariner Construction "always said to wear the seatbelts."  See Docket No. 21-10, p. 36.

Plaintiff, the Court finds that reasonable minds could differ as to whether the Defendants had a duty to design and/or manufacture the P-3000 with a ROPS. Accordingly, summary judgment is denied on this claim.

### E. <u>BREACH OF WARRANTY</u>

The Plaintiff also alleges that the Defendants breached the implied warranties of merchantability and fitness for a particular purpose. The Plaintiff contends that "[t]o be fit for the purpose of compacting roadway shoulders, a rubber-tired roller compactor must have some form of roll-over protection system," and that "[w]hen the Defendants manufactured and/or sold the P-3000, they were aware or had reason to be aware that the P-3000 was to be used for compacting roadway shoulders." <u>See</u> Docket No. 1-1. The warranties which the Plaintiff alleges have been violated are contained in the Uniform Commercial Code (U.C.C.), as adopted by the North Dakota Legislative Assembly at N.D.C.C. §§ 41-02-31 (U.C.C. 2-314) and 41-02-32 (U.C.C. 2-315).

44

In Spieker v. Westgo, Inc., 479 N.W.2d 837 (N.D. 1992),[14] the North Dakota Supreme Court considered whether the four-year statute of limitations under N.D.C.C. § 41-02-104[15] applies to products liability actions between parties who are not in privy.  The court said,

> Although the six-year statute of limitations applies to product liability actions based upon negligence or strict liability [Erickson v. Scotsman, Inc., 456 N.W.2d 535 (N.D. 1990)], we conclude that under our statutory scheme, Section 41-02-104, N.D.C.C., applies to breach of warranty claims involving transactions in goods which result in personal injuries to parties who are not in privy.  The trial court did not err in determining that Section 41-02-104, N.D.C.C., applied to the Spiekers' breach of warranty claim.

Spieker, 479 N.W.2d at 848.  "In the case of a breach of warranty, the claim accrues when tender of delivery is made, unless the seller makes a warranty explicitly extending to the future performance of the goods."  Superior, Inc. v. Behlen Mfg. Co., 738 N.W.2d 19, 27 (N.D. 2007); accord N.D.C.C. § 41-02-104(2).

---

[14]  In Spieker, the plaintiff was injured while working as a farmhand on the Brekers' family farm.  The plaintiff was injured when he was unloading corn from a truck into a dryer bin with an auger and was struck in the arm and leg by the auger tube.  The plaintiff brought a products liability action against the manufacturer and seller of the auger and the Brekers, among others.

[15]  N.D.C.C. § 41-02-104 governs the statute of limitations in contracts for sale and provides:

1.  An action for breach of any contract for sale must be commenced within four years after the claim for relief has accrued.  By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

2.  A claim for relief accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach.  A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the claim for relief accrues when the breach is or should have been discovered.

3.  When an action commenced within the time limited by subsection 1 is so terminated as to leave available a remedy by another action for the same breach such other action may be commenced after the expiration of the time limited and within six months after the termination of the first action unless the termination resulted from voluntary discontinuance or from dismissal for failure or neglect to prosecute.

4.  This section does not alter the law on tolling of the statute of limitations nor does it apply to claims for relief which have accrued before this title becomes effective.

The Defendants argue that the four-year statute of limitations under N.D.C.C. § 41-02-104 has run, therefore, barring the Plaintiff's breach of warranty claims. The Plaintiff contends that "North Dakota equity jurisprudence holds that a statute of limitations to rectify a wrong does not run while the wrong continues to exist, but rather the damages are limited to those incurred during the limitations period." See Docket No. 25 (citing Investors' Syndicate v. N. Am. Coal & Mining Co., 153 N.W. 472 (1915)). The North Dakota Supreme Court in Investors' Syndicate considered whether an intervenor's claim was barred by the statute of limitations in an action to remove a cloud from the title to land caused by a fraudulent mortgage. The court found that the statute of limitations did not run because (1) a title owner has the right to remove a cloud at any time while he continues to be the owner and (2) all of the facts constituting the fraud were not known at the time the action was filed, and the statute of limitations shall not begin to run until the fraud is discovered. Investors' Syndicate, 153 N.W. at 474, 475. The present case is a products liability action, not an action to remove a cloud from a title, and the Plaintiff has not alleged fraud. Thus, the Court finds that the ruling in Investors' Syndicate is inapplicable.

The Plaintiff also contends that equity mandates relief from applying the four-year statute of limitations. The Plaintiff states,

> It was impossible for the plaintiff to bring this suit before the statute of limitations ran in 1994. Her husband died when the P-3000 rolled over on him in 2006, 12 years after the statute ran, and he did not even work for Mariner Construction when it purchased the P-3000 in 1990. Moreover, Komatsu knew of the defective condition of the P-3000 but Mariner Construction never learned of it until Mr. Reiss died in 2006. Mr. Reiss himself never knew that ROPS was available for the P-3000.

See Docket No. 25. The Plaintiff relies on the ruling in JN Exploration & Prod. v. W. Gas Res., Inc., 153 F.3d 906 (8th Cir. 1998), in support of this proposition. In JN Exploration & Prod., the Eighth

46

Circuit determined that N.D.C.C. § 41-02-104 expressly prohibits the application of the discovery rule to extend the four-year statute of limitations period, and that the four-year statute of limitations applies absent grounds for equitable relief.  The court stated,

> Moreover, the North Dakota Century Code expressly prohibits the application of the discovery rule in this context.  It provides that actions for breach of contract under Article II of the U.C.C. accrue "when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach."  N.D. Cent. Code § 41-02-104(2) (U.C.C. § 2-725).  The clear import of this sentence is to prevent the application of the discovery rule, and to apply the discovery rule here would be to write section 41-02-104(2) out of the code.  Accordingly, JN's knowledge or lack of knowledge of the alleged breach is irrelevant, and JN's contract claims are barred by the application of section 41-02-104 absent some grounds for equitable relief from the effect of the statute of limitations.

JN Exploration & Prod., 153 F.3d at 913-14.

In this case, the evidence reveals that Mariner Construction leased the P-3000 in July 1990 and ultimately purchased it on December 31, 1990.  See Docket Nos. 21-3 and 21-4.  Mariner Construction was aware when it purchased the P-3000 in 1990 that the compactor lacked a ROPS which is obvious by looking at it.  This is not a case where traditional equitable defenses, such as equitable estoppel, apply.  Accordingly, the Court finds that this is not the type of case warranting equitable relief from application of the four-year statute of limitations period under N.D.C.C. § 41-02-104.

The action was filed in state court in August 2008 and removed to federal district court on September 24, 2008, which is more than four years after Diesel Machinery delivered the P-3000 to Mariner Construction in 1990.  See Docket Nos. 1 and 1-1.  Thus, the Court finds that the four-year statute of limitation period under N.D.C.C. § 41-02-104 has run, barring the Plaintiff's breach of warranty of merchantability and fitness claims.  Summary judgment is granted on the Plaintiff's breach of warranty claims.

F.      **COMPARATIVE FAULT**

The Court has denied summary judgment on the Plaintiff's claims of strict products liability, failure to warn, and negligence.  Under North Dakota's modified comparative fault statute, N.D.C.C. § 32-03.2-02,

> Contributory fault does not bar recovery in an action by any person to recover damages for death or injury to person or property unless the fault was as great as the combined fault of all other persons who contribute to the injury, but any damages allowed must be diminished in proportion to the amount of contributing fault attributable to the person recovering.

With the codification of Section 32-03.2-02, the North Dakota Legislative Assembly "clearly intended to replace joint and several liability with several allocation of damages among those who commit torts in proportion to the fault of those who contributed to an injury." Rodenburg v. Fargo-Moorhead Young Men's Christian Ass'n, 632 N.W.2d 407, 417 (N.D. 2001) (citing Hurt v. Freeland, 589 N.W.2d 551, 557 (N.D. 1999); Stewart v. Ryan, 520 N.W.2d 39, 45 (N.D. 1994)). In accordance with N.D.C.C. § 32-03.2-02, the jury will be allowed to consider the "fault" of each party and assess whether the manner in which Henry Reiss operated the P-3000 on September 26, 2006 contributed to his injuries and damages will be diminished in proportion to the amount of contributing fault.

IV.      **CONCLUSION**

For the reasons set forth above, the Court **GRANTS IN PART AND DENIES IN PART** the Defendants' motions for summary judgment (Docket Nos. 20 and 22).  Summary judgment is granted on the Plaintiff's breach of warranty claims and denied on the Plaintiff's strict products liability, failure to warn, and negligence claims.

**IT IS SO ORDERED.**

Dated this 17th day of August, 2010.

_/s/ Daniel L. Hovland_____

Daniel L. Hovland, District Judge
United States District Court